UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LEONARDO JOHNSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-13274-IT |
| | * | |
| LINDA HAN et al. | * | |
| | * | |
| Defendants. | * | |

ORDER

July 17, 2015

TALWANI, D.J.

I.   Introduction

In November 2009, Plaintiff Leonardo Johnson ("Johnson") was convicted for
distribution of a controlled substance in a school zone. At trial, the prosecution introduced the
results of drug tests performed by Annie Dookhan ("Dookhan") and Daniel Renczkowski
("Renczkowski") of the William F. Hinton Drug Laboratory in Jamaica Plain, Massachusetts (the
"Hinton Lab"). Johnson now brings claims under 42 U.S.C. § 1983 against employees of the
Hinton Lab for violations of his constitutional rights arising from the falsification of this drug-
analysis evidence and the withholding of exculpatory negative test results. Defendant Elizabeth
O'Brien ("O'Brien") has filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [#30] as
well as a Motion for Judicial Notice in Support of its Motion to Dismiss Plaintiff's Complaint
[#32] [sic]. For the reasons set forth below, the court DENIES both motions.

II.   Factual Allegations

For the purposes of this motion to dismiss, the court takes the factual allegations in the
complaint as true and construes the facts in the light most favorable to the plaintiff. See Ashcroft

v. Iqbal, 556 U.S. 662, 678-79 (2009).

     A.     *Drug Tests Performed by the Hinton Lab*

In November 2008, Johnson sold an undercover officer a substance that resembled crack-cocaine but was actually part of a nut.  Compl. ¶¶ 60-62 [#1].  Johnson was arrested and charged with distribution of a Class B controlled substance within a school zone.  Compl. ¶ 62.  The substance was sent to the Hinton Lab for testing.  Compl. ¶ 65.

On February 4, 2009, Dookhan indicated on a Drug Powder Analysis Form that she had completed two preliminary tests on the substance and both tests had returned positive results for the presence of cocaine.  Compl. ¶ 70.  Dookhan's statements on this form were false.  Compl. ¶ 71.  She had not performed any tests; she had "dry labbed"[1] the substance.  Compl. ¶ 71.

On February 10, 2009, either Dookhan or Renczkowski performed several gas chromatography and mass spectrometry tests ("GC/MS test") on the substance.  Compl. ¶ 74.  In each GC/MS test, the substance tested negative for cocaine.  Compl. ¶ 74.  Either Dookhan or Renczkowski filled out a results form.  Compl. ¶ 74.  Where a negative result should have been recorded for the substance, either Dookhan or Renczkowski left the form blank.  Compl. ¶ 74.

On February 12, 2009, Dookhan prepared the substance for another GC/MS test.  Compl. ¶ 75.  The next day, either Dookhan or Renczkowski performed the GC/MS test.  Compl. ¶ 76.  The substance tested positive for cocaine.  Compl. ¶ 76.  This positive test result was due to either: (1) falsification; (2) cross-contamination by other samples, or (3) switching the substance with known sample of cocaine.  Compl. ¶ 75.  Either Dookhan or Renczkowsk completed a

---

[1] According to the complaint, "dry labbing" is "a practice where the primary chemist bypasses the preliminary tests and simply guesses whether the substance is what the police allege it to be."  Compl. ¶ 30.

results form, indicating that the substance had tested positive for cocaine.  Compl. ¶ 76.  At the same time, either Dookhan or Renczkwoski retroactively filled out the February 10, 2009 results form by marking that these tests results had also been positive.  Compl. ¶ 76.

Dookhan and Renczkowski prepared a printout of the positive test result and signed a control card indicating that the substance had tested positive for cocaine.  Compl. ¶¶ 77-78.  The prior negative results were not referenced on the control card.  Compl. ¶ 77.  On April 17, 2009, Dookhan provided the prosecutor in Johnson's case with a discovery packet.  Compl. ¶ 79.  Only the positive test results were included in the discovery packet.  Compl. ¶ 79.  None of Dookhan's supervisors reviewed the discovery packet before Dookhan gave it to the prosecutor.  Compl. ¶ 79.

Johnson's trial began on November 16, 2009.  Compl. ¶ 84.  Dookhan and Renczkowski testified for the prosecution.  Compl. ¶ 88.  Dookhan falsely testified that she had a Master's Degree in Chemistry and that she had conducted two preliminary tests on the substance, both which had returned positive results for cocaine.  Compl. ¶¶ 89-90.  Dookhan further testified that the GC/MS test showed a positive result for cocaine; she did not mention the negative GC/MS tests.  Compl. ¶ 93.  Renczkowski similarly testified falsely that he had performed tests on the substance that returned positive results for cocaine.  Compl. ¶ 92.  Renczkowski also omitted mention of the negative GC/MS tests.  Compl. ¶ 92.  Johnson was convicted on November 18, 2009.  Compl. ¶ 94.  He served two years and one day in prison.  Compl. ¶ 94.

B.    *O'Brien's Role at the Hinton Lab*

At all times relevant to this case, O'Brien worked in the same room as Dookhan at the Hinton Lab.  See Compl. ¶ 26.  O'Brien's title was "Chemist III," which made her the "team leader" of the chemists in her room.  Compl. ¶ 26.  According to Johnson, as team leader

O'Brien was Dookhan's immediate supervisor.  Compl. ¶ 47.

"Sometime in 2009," O'Brien received a promotion to "Lab Supervisor I."  Compl. ¶ 26. After her promotion, O'Brien took control over the evidence storage room used by the chemists in the room she shared with Dookhan.  Compl. ¶ 26.  O'Brien then became aware that Dookhan took samples from the evidence room without properly "logging . . . out" the samples.  Compl. ¶ 26.

In 2007 or 2008, before her promotion, another employee expressed concern to O'Brien about Dookhan's testing rate.  Compl. ¶ 47.  O'Brien dismissed these concerns.  Compl. ¶ 47. Both as "Chemist III" and "Lab Supervisor I," O'Brien directly observed Dookhan's lab techniques and testing methods.  Compl. ¶ 26.  O'Brien was aware of Dookhan's purported testing rate, and O'Brien understood that this rate was improbably high for a chemist following proper lab procedures.[2]  Compl. ¶¶ 26, 42.  O'Brien ignored the implausible number of tests Dookhan claimed to have performed.  Compl. ¶ 42.  O'Brien was also aware that Dookhan misrepresented her educational credentials on her resume.  Compl. ¶ 26.

Moreover, O'Brien knew that the Hinton lab operated with "poorly enforced chain of custody practices, little or no internal auditing, non-existent inventories of the evidence safe, and no oversight, supervision, or discipline of the chemists."  Compl. ¶ 11.  The Hinton Lab had a policy not to furnish Brady materials or negative test results to prosecutors.  Compl. ¶¶ 194-95, 206-07.  O'Brien "knew or recklessly disregarded that such a policy existed." Compl. ¶¶ 197, 210.  The Hinton Lab also had an affirmative policy of providing false evidence and perjured testimony to prosecutors.  Compl. ¶¶ 217-18.  O'Brien "knew or recklessly disregarded" that

---

[2] Johnson alleges that Dookhan's testing volume "[i]n many cases was twice that of the average chemist – twice peaking at more than 5 times the lab average."  Compl. ¶¶ 28, 41.

policy.  Compl. ¶ 220.

III.     Discussion

Johnson brings Counts I through IV of his complaint against O'Brien.  See Compl. ¶¶ 192-237.  Each count is predicated on a theory of supervisory liability.  Johnson claims that O'Brien condoned the withholding of Brady material (Count I), the withholding of negative test results (Count II), and the knowing presentation of falsified inculpatory evidence (Count III).  Johnson further alleges that O'Brien failed to train, supervise, or discipline Dookhan and Renczkowski (Count IV).

O'Brien brings four arguments in support of her motion to dismiss: (1) the obligation to disclose exculpatory and impeachment evidence under Brady does not apply to state-employed chemists, (2) the complaint fails to plausibly allege that O'Brien was a supervisor at the time Dookhan and Renczkowski tested the substance, (3) the complaint fails to plausibly plead the requisite elements of supervisory liability, and (4) qualified immunity bars liability.  See Def.'s Mem. Law Supp. Mot. Dismiss Pursuant Fed. R. Civ. P. 12(b)(6) [#31] [hereinafter Def.'s Mem.].

A.     Brady *Obligations of State-Employed Lab Chemists*

O'Brien argues that state-employed lab chemists have no obligation to disclose evidence under Brady v. Maryland, 373 U.S. 83 (1963).  O'Brien reasons that because the failure to disclose negative test results is not a direct violation of Johnson's constitutional rights, it cannot be the basis of a claim of supervisory liability.[3]

---

[3] O'Brien does not contest that the materials in question should have been disclosed under Brady, but only that Hinton Lab employees did not have any obligation regarding such disclosure. See Junta v. Thompson, 615 F.3d 67, 74 (1st Cir. 2010) ("The Supreme Court has identified a three-part test for adjudicating Brady claims: (1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;' (2) 'that

Under <u>Brady</u>, it is "[t]he prosecution's affirmative duty to disclose evidence favorable to defendant."  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 432 (1995).  However, the suppression of evidence unknown to a prosecutor and held only by members of the investigative team is still a <u>Brady</u> violation.  <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) ("<u>Brady</u> suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not the prosecutor.'" (quoting <u>Kyles</u>, 514 U.S. at 438)).

In the context of § 1983 liability, the First Circuit has held that investigatory officials such as police officers may be liable for their failure to disclose <u>Brady</u> materials.  <u>See</u> <u>Brady v. Dill</u>, 187 F.3d 104, 114-15 (1st Cir. 1999) ("[A] police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory evidence.  In these cases, the constitutional wrong results from the officer's failure to deliver material information to competent authorities." (internal citations omitted)); <u>id.</u> ("[W]hen a police officer acts as an information provider, he may be obliged to reveal exculpatory facts . . . to a prosecutor or a judicial officer."); <u>see also</u> <u>Drumgold v. Callahan</u>, 707 F.3d 28, 38 (1st Cir. 2013) ("[L]aw enforcement officers have a correlative duty [to a prosecutor's <u>Brady</u> obligation] to turn over to the prosecutor any material evidence that is favorable to a defendant."); <u>Hayley v. City of Bos.</u>, 657 F.3d 39, 50 (1st Cir. 2011) ("There is no doubt that this due process protection applies to police officers who deliberately keep the defense in the dark about important evidence.").

Although the First Circuit has not expressly held that <u>Brady</u> obligations similarly extend to state-employed lab chemists, O'Brien provides no persuasive reason to distinguish between different members of the state investigatory team in this regard.  As found in <u>Jones v. Han</u>, 993

---

evidence must have been suppressed by the State, either willfully or inadvertently;' and (3) 'prejudice must have ensued.'" (alteration in original) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999))).

F. Supp. 2d 57, 65 (D. Mass. 2014):

> [s]tate drug analysts are as much an arm of the government as are police officers, and can also inflict constitutional injury if they fail to disclose material exculpatory or impeachment information to the prosecution. Therefore, it seems clear that defendants can be found liable for failing to provide exculpatory or impeachment information to the prosecutor for disclosure to the defendant.

See also Brown v. Miller, 519 F.3d 231, 238 (5th Cir. 2008) (allowing § 1983 claim against state crime lab technician for suppressing exculpatory blood results); Gregory v. City of Louisville, 444 F.3d 725, 744 (6th Cir. 2006) (holding that an Examiner in the State Police Crime Laboratory who deliberately withheld exculpatory evidence violated a criminal defendants' constitutional rights); Pierce v. Gilchrist, 359 F.3d 1279, 1293 (10th Cir. 2004) (stating that "the actions of a police forensic analyst who prevaricates and distorts evidence" are "equally repugnant to the Constitution" as the actions of an officer who fabricates evidence); Bibbins v. City of Baton Rouge, 489 F. Supp. 2d 562, 573 (M.D. La. 2007) (denying summary judgment on a Brady claim against a state-employed fingerprint analyst). Accordingly, the court will not dismiss Count I on this ground.

### B.   O'Brien's Alleged Supervisory Role

O'Brien argues that the complaint, which states only that she was promoted "[s]ometime in 2009," see Compl. ¶ 26, is fatally vague as to when she became Dookhan and Renczkowski's supervisor. According to O'Brien, at the time Dookhan and Renczkowski tested the substance in February 2009, she had not yet been promoted. See Def.'s Mem. at 14-15. As a "Chemist III" at the time of testing, O'Brien argues that she had no supervisory authority over Dookhan and Renczkowski. See id. Accordingly, O'Brien seeks dismissal of Counts I through IV on the ground that supervisory liability cannot attach. See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994) (stating that a supervisor must have "the power and authority to

alleviate" the constitutional violation perpetrated by a subordinate); Miranda v. Munoz, 770 F.2d

255, 260 (1st Cir. 1985) (requiring the "power and duty to alleviate the conditions which led to

the violation").

As a preliminary matter, Johnson alleges that O'Brien was Dookhan and Renczkowski's

supervisor at the time she held the "Chemist III" title, vitiating any need to determine the date of

her promotion.  In support of this argument, Johnson points to the complaint's allegation that

O'Brien's role as "Chemist III" made her a "team leader" in the lab room where Dookhan and

Renczkowski worked.  Compl. ¶ 26.  The complaint, however, includes no factual allegations

regarding the role of team leaders or whether individuals in this position have any supervisory

authority over other chemists.  The complaint further states that O'Brien's role as team leader

made her Dookhan and Renczkowski's "immediate supervisor."  Compl. ¶ 47.  This statement,

however, is a legal conclusion, not a factual allegation, and need not be credited by the court as

true.  See Haag v. United States, 736 F.3d 66, 69 (1st Cir. 2013) (stating that legal conclusions in

a complaint need not be accepted as true for purposes of a motion to dismiss).  Accordingly, the

complaint fails to plead facts plausibly establishing that Johnson was Dookhan and

Renczkowski's supervisor during the time that O'Brien held the position of "Chemist III."

As to when O'Brien received supervisory authority, O'Brien cites an intra-office

memorandum that lists March 8, 2009 as the effective date of her promotion from "Chemist III"

to "Lab Supervisor I."  See Def.'s Mot. Judicial Notice Supp. Mot. Dismiss Pl.'s Complaint, Ex.

A [#32].  Although this memorandum is not attached to or incorporated in the complaint,

O'Brien argues that the court may properly take judicial notice of the memorandum as a public

record.  See id. at 1-2.  However, O'Brien has provided no case law clearly standing for the

proposition that an intra-office memorandum, accessed through a Freedom of Information Act

request, is a proper document for judicial notice.  Therefore, the court will not take judicial notice of this document, as it finds such notice unwarranted.

Even assuming, however, that O'Brien was not promoted until March 8, 2009, the acts allegedly in violation of Johnson's constitutional rights continued beyond February 2009.  First, Dookhan prepared and delivered the discovery packet—allegedly excluding negative test results and including falsified positive results and a resume misstating Dookhan's credentials—to the state prosecutor in April 2009.  Second, Dookhan and Renczkowski testified at Johnson's trial in November 2009, at which time both allegedly testified falsely.  Based on the promotion date asserted by O'Brien—March 8, 2009—it is uncontested that at the time of these later actions O'Brien served as Dookhan and Renczkowski's supervisor.  Moreover, even if the March 8, 2009 date were ignored, the complaint's allegation that O'Brien was promoted in 2009 suffices to raise a plausible inference that the date of O'Brien's promotion predated one or more of these events.  Therefore, the court will not dismiss Counts I through IV on this ground.

C.    *Supervisory Liability*

O'Brien further argues that Counts I through IV should be dismissed because the complaint has failed to allege the necessary elements of a claim of supervisory liability.  See Def.'s Mem. at 10-14.  Specifically, O'Brien argues that the complaint does not include facts plausibly suggesting that O'Brien: (1) had actual or constructive knowledge of the direct constitutional violations alleged, amounting to deliberate indifference; or (2) undertook acts or omissions causally related to those violations.  O'Brien emphasizes that the complaint concedes that in 2010 she raised concerns regarding Dookhan's work with her supervisors.  Accordingly, O'Brien argues she could not have been deliberately indifferent to the alleged violations of Johnson's constitutional rights.

9

*Respondeat superior* liability is unavailable for § 1983 claims.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978); Maldonado-Denis, 23 F.3d at 581.  Where there is evidence of a constitutional violation, supervisory liability attaches only if the supervisory officials engaged in acts or omissions amounting to either "direct participation in the unconstitutional conduct, or . . . condonation or tacit authorization" of that conduct.  Whitfield v. Meléndez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (citing Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)).

A plaintiff alleging supervisory liability must show causation in the form of an "affirmative link" between the supervisory official's conduct and the violative conduct of his subordinate.  See Camilo-Robles, 175 F.3d at 44.  This requires a "strong causal connection between the supervisor's conduct and the constitutional violation." Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014); see also Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) ("[A] supervisor may not be held liable . . . unless there is an 'affirmative link . . . such that the supervisor's conduct led inexorably to the constitutional violation.'" (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011))).  "[A]ctual knowledge of censurable conduct" is not required to show causation, so long as the supervisor "would have known [of the conduct] but for his deliberate indifference or willful blindness." Maldonado-Denis, 23 F.3d at 582.  "[A] sufficient causal nexus [to show deliberate indifference] may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the [violative] conduct" despite having "the power and authority to alleviate it." Id.  A plaintiff may establish deliberate indifference by showing "a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Ramírez-Lluveras, 759 F.3d at 20 (citation and internal quotation marks omitted); see also Barreto-Rivera v. Medina-Vargas, 168 F.3d 42,

49 (1st Cir. 1999).  However, "isolated instances of unconstitutional activity ordinarily are insufficient" to establish supervisory liability.  Maldonado-Denis, 23 F.3d at 582.

O'Brien's focus on her 2010 actions misplaced.  In assessing whether she may be liable for the alleged violations of Johnson's rights, which occurred in 2009, behavior in or after 2010 is inapposite.

Here, the complaint alleges that, during or before 2009, O'Brien: (1) knew Dookhan's resume lied about her educational credentials, (2) saw Dookhan's testing rate and understood this rate to be implausibly high if proper testing procedures were used, (3) observed Dookhan's lab protocols, and (4) had received and dismissed a report of concerns about Dookhan's high testing rate.  The complaint also alleges that, after her promotion to "Laboratory Supervisory I," O'Brien became aware that Dookhan removed samples from the evidence room without proper chain-of-custody procedures.

Counts I through IV allege claims of supervisory liability based on O'Brien's alleged role in allowing her subordinates to withhold exculpatory evidence and falsify evidence of guilt and in failing to train, supervise, or discipline these subordinates for their actions.  As alleged in the complaint, the substance was tested in February 2009, Dookhan prepared and turned over the discovery packet in April 2009, and Dookhan and Renczkowski testified in November 2009.  Based on O'Brien's own claim of a promotion date of March 8, 2009, the preparation of the discovery packet and the trial testimony occurred while O'Brien was Dookhan and Renczkowski's supervisor.

At least by April 2009, O'Brien knew that Dookhan had lied about her educational credentials, knew that Dookhan claimed to test a high rate of samples and understood these claims to be implausible, observed Dookhan fail to follow lab protocols, and had received prior

complaints about Dookhan's testing rates.  At the motion-to-dismiss stage, these factual

allegations suffice to state a claim that O'Brien was aware, or should have been aware, of a

pattern of behavior by her subordinates that was highly likely to lead to the violation of

constitutional rights (either through withholding negative test results or falsifying positive test

results).  The complaint further plausibly pleads that O'Brien acted with deliberate indifference

towards that behavior, effectively condoning its continuation throughout 2009 despite her

supervisory role.  Accordingly, the court will not dismiss Counts I through IV on this ground.

> D.    *Qualified Immunity*

O'Brien further argues that Counts I through IV should be dismissed under the doctrine

of qualified immunity because there is no clearly established law that supervisors violate a

criminal defendant's constitutional rights by allowing subordinates to withhold exculpatory

evidence and to fabricate inculpatory evidence, or by failing to train and supervise their

subordinates in conducting drug-analysis tests and disclosing results.

The court uses a two-step test to determine if officers are eligible for qualified immunity:

(1) whether the claimant has alleged the deprivation of a constitutional right; (2) whether the

right was clearly established at the time of the alleged action or inaction, such that an objectively

reasonable official would have understood his action to have violated that clearly established

right.  Maldonado v. Fontanes, 568 F.3d 263, 268-69 (1st Cir. 2009).  In the context of qualified

immunity for supervisory liability:

> the 'clearly established' prong of the qualified immunity inquiry is satisfied when
> (1) the subordinate's actions violated a clearly established constitutional right, and
> (2) it was clearly established that a supervisor would be liable for constitutional
> violations perpetrated by his subordinates in that context. In other words, for a
> supervisor to be liable there must be a bifurcated 'clearly established' inquiry—one
> branch probing the underlying violation, and the other probing the supervisor's
> potential liability.

Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998) (internal citations omitted).

As to the first step of this inquiry, O'Brien generally does not challenge the sufficiency of the complaint's allegations regarding Dookhan and Renczkowski's unconstitutional acts.[4] Accordingly, the court finds that Johnson has plausibly pleaded a violation of his constitutional rights both for the exclusion of exculpatory evidence and for the alleged fabrication of false evidence against him.  See Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004) ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

As to step two of the qualified immunity test, a "law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law applies with obvious clarity' to the specific conduct." Jennings v. Jones, 499 F.3d 2, 16 (1st Cir. 2007) (alteration omitted) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  Under First Circuit precedent, in determining whether a law was clearly established, the court may consider "not only Supreme Court precedent, but all available case law." Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 93 (1st Cir. 2002); see also United States v. Lanier, 520 U.S. 259, 269 (1997) (rejecting the argument that a law must not be clearly established if there are "disparate decisions in various Circuits" and leaving open the possibility that "decisions of the Courts of Appeals and

---

[4] As an exception, O'Brien argues that no Brady violation occurred because state-employed chemists have no duty to disclose exculpatory or impeachment evidence.  The court has considered and rejected this argument, supra pt. III(A).

other courts" are sufficient to show that a law is clearly established).

Prior to 2009, it was clearly established by the First Circuit that a police officer could not withhold exculpatory evidence. <u>See, e.g.</u>, <u>Limone</u>, 372 F.3d at 39 ("[A] reasonable officer . . . would have understood that [failing to disclose exculpatory evidence and developing a witness despite knowledge the witness would commit perjury] would have . . . infracted the plaintiffs' constitutional rights."); <u>see also</u> <u>Haley</u>, 657 F.3d at 51 (denying qualified immunity to police officer who intentionally withheld exculpatory evidence on the ground that law against such withholding was clearly established as early as 1972).

The prohibition on fabricating inculpatory evidence was also well-established before 2009. <u>See</u> <u>Pyle v. Kansas</u>, 317 U.S. 213, 216 (1942) (holding the knowing use of false evidence to obtain a conviction unconstitutional); <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935) (holding to be unconstitutional any conviction "contrived . . . through the pretense of a trial which in truth is . . . a deliberate deception of court and jury by the presentation of testimony known to be perjured); <u>Limone</u>, 372 F.3d at 44-45 ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

The First Circuit has not expressly ruled that it is clearly established that a state-employed chemist similarly cannot withhold exculpatory evidence from prosecutors or present false inculpatory evidence at trial. However, in 2005 the First Circuit held that "[t]he intentional or reckless fabrication of inculpatory evidence or omission of material exculpatory evidence by a forensic examiner in support of probable cause may amount to a constitutional violation." <u>See</u> <u>Burke v. Town of Walpole</u>, 405 F.3d 66, 89 (1st Cir. 2005). The court sees no reason to distinguish between a forensic report used to support probable cause and a drug-analysis report

used to support conviction.  See Pierce, 359 F.3d at 1299 ("There is no moral, constitutional,

common law, or common sense difference between providing phony evidence in support of an

arrest and providing phony evidence in support of continued confinement and prosecution.").

This court has similarly held that it was clearly established before 2009 that a forensic analyst

could not withhold exculpatory information.  See Charles v. City of Bos., 365 F. Supp. 2d 82,

88-89 (D. Mass. 2005) (holding that, at least as early as 1980, a forensic criminalist "must have

known of his legal obligation to disclose exculpatory evidence to the prosecutors . . . and his

obligation not to cover up a Brady violation by perjuring himself").[5]

Other Courts of Appeals have held the same.  See, e.g., Brown, 519 F.3d at 238 ("[T]he

law was sufficiently clear in 1984 that a state crime lab technician would have known the

suppression of exculpatory blood test results would violate a defendant's rights."); Gregory, 444

F.3d at 744 (stating that an Examiner at the state crime lab could not "seriously contend that a

reasonable [investigator] would not know that such actions [including withholding exculpatory

evidence] were inappropriate and performed in violation of an individual's constitutional . . .

rights" (alterations in original) (citation omitted)); Pierce, 359 F.3d at 1299 ("[A]n official

[employed as a forensic chemist] . . . in 1986 had 'fair warning' that the deliberate or reckless

falsification or omission of evidence was a constitutional violation . . . .  [Such] an official . . .

could not have labored under any misapprehension that the knowing and reckless falsification

and omission of evidence was objectively reasonable."); cf. Villasana v. Wilhoit, 368 F.3d 976,

---

[5] The court in Charles, 365 F. Supp. 2d at 88-89, theorized that "some criminalists who have
minor law enforcement roles (e.g. lab technicians who merely test numbered vials) may not have
independent Brady obligations."  This court is not fully persuaded by this distinction.
Nonetheless, Dookhan's role included not only testing the substance but preparing a discovery
packet for the prosecution and testifying at trial.  Renczkowski similarly testified at trial.

978, 980 (8th Cir. 2004) (holding that the liability of crime lab technicians for <u>Brady</u> violations was not clearly established in 2004, but finding that the deliberate failure to disclose exculpatory evidence by a technician could be a constitutional violation).

Accordingly, the court finds that a reasonable state-employed chemist would have known in 2009 that she had a duty not to withhold exculpatory test results and that she could not knowingly present fabricated evidence of guilt in support of a criminal defendant's conviction. Even if such a rule was not established in case law, the court further finds that this rule is an obvious extension of the principle that a police officer cannot withhold exculpatory evidence or fabricate inculpatory evidence. <u>See</u> <u>Jones</u>, 993 F. Supp. 2d at 67 ("It was well-established that a police officer could be held liable for not disclosing exculpatory information. It would have been obvious that the same principle would extend to state drug-laboratory chemists and supervisors."). Accordingly, the court reaches the same conclusion under either method of demonstrating that a law is clearly established.

Having found the law proscribing a state-employed lab chemists from withholding exculpatory evidence and presenting fabricated evidence of guilt to be clearly established, the court must determine if, in 2009, a reasonable supervisor would understand that she "would be liable for constitutional violations perpetrated by her subordinates in that context." <u>Camilo-Robles</u>, 151 F.3d at 6. Although the court has not identified extensive case law expressly treating supervisory liability in this context, the court finds that no reasonable supervisor could fail to grasp that liability would attach for exhibiting deliberate indifference towards the falsification and withholding of evidence by her subordinates. The prohibition of such unconstitutional behavior applies with obvious clarity to the acts of supervisors who condone or deliberately turn a blind eye to these acts. <u>See, e.g.</u>, <u>Jones</u>, 993 F. Supp. 2d at 69 (holding that

supervisors "should have reasonably understood that their conduct [in allowing Dookhan to continue] jeopardized the constitutional rights of criminal defendants subject to the laboratory testing procedures"); see also Solomon v. Dookhan, No. 13-10208-GAO, 2014 WL 317202, at *13 (D. Mass. Jan. 27, 2014) ("[N]o reasonable official . . . could believe that it was permissible . . . to knowingly abet Dookhan's misconduct . . . .").

IV.     Conclusion

For the above-stated reasons, O'Brien's Motion to Dismiss [#30] and Motion for Judicial Notice in Support of its Motion to Dismiss Plaintiff's Complaint [#32] are DENIED.

IT IS SO ORDERED.

July 17, 2015                                              /s/ Indira Talwani
                                                          United States District Judge