UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARDO JOHNSON,<br><br>    Plaintiff,<br><br>    v.<br><br>LINDA HAN, JULIANNE NASSIF, CHARLES SALEMI, ELIZABETH O'BRIEN, DANIEL RENCZKOWSKI and, ANNIE DOOKHAN,<br><br>    Defendants. | CIVIL ACTION NO. 1:14–CV–13274–IT |

## AFFIDAVIT OF PLAINTIFF LEONARDO JOHNSON

I, Leonardo Johnson, hereby depose and state as follows:

1. My name is Leonardo Johnson. I am a 53-year resident of Boston.

2. I have personal knowledge of the facts stated herein, unless stated on information and belief, and if called upon to testify to those facts I could and would competently do so.

3. As a result of Annie Dookhan's misconduct, I served a 474-day prison sentence (or 1 year, 3 months, and 17 days) for a crime I did not commit.

### *Background*

4. On November 15, 2008, I was arrested by the Boston Police. An undercover police officer accused me of selling drugs, but the substance that I had was not drugs.

5. At first, I didn't think I would ever face prison time. I assumed that the criminal justice system would protect me and reveal the truth.

6. There were several court hearings, and each time I began to get more worried because there was no suggestion that the charges would be dropped.

7. A few months after my arrest, the Commonwealth filed a motion for expedited drug analysis. The motion was allowed.

### *Dookhan's Misconduct*

8. According to government records, Annie Dookhan began testing my sample less than one week after the motion for expedited drug analysis was allowed. Those same records show that Annie Dookhan knew right away that my sample did not contain drugs and that I was innocent.

9. Government records show that Annie Dookhan and Daniel Renczkowski both eventually certified that my sample contained drugs, even though both had been aware of earlier negative test results. Annie Dookhan and Daniel Renczkowski signed a drug certification certifying that my sample contained cocaine.

10. When I learned about the drug certification, I was shocked. My mental condition got worse. The anxiety that I had been dealing with became a big problem. I began to feel confused, frustrated, and helpless.

11. In the months leading up to trial, I was held in pretrial detention. I was held even though Annie Dookhan knew I was innocent.

12. During the pretrial detention, my mental condition fell apart. While I was able to meet with a staff psychologist, the only thing the psychologist could do for me

was prescribe drugs. These drugs had side effects that made me feel worse. I felt "doped up." I had insomnia.

13. The insomnia made my anxiety worse, as I could only think about being an innocent man trapped in jail.

14. My confusion and frustration turned to anger and despair.

## *My Trial*

15. My criminal trial started in the middle of November 2009. From the moment the jury walked in, I could tell by the way they looked at me that I would be found guilty.

16. At the trial, various BPD officers testified against me. To the best of my recollection, two of the officers testified that they could tell based on their experience that what I had in my possession was crack cocaine simply by how it looked.

17. One officer testified that he had personally measured the distance between where I was arrested and the nearest school to establish a school zone violation.

18. After the officers, Annie Dookhan testified. There are no words to describe how I felt sitting there and watching her as she lied under oath. I knew that she was lying but I didn't matter. She was cool and comfortable, like she was reading from a script.

19. After Annie Dookhan, Dan Renczkowski testified. He repeated the same false testimony that my sample contained drugs.

20. At the end of the trial, I testified. I understood that I had the right not to testify. But I knew that I would be telling the truth.

21. I told the truth.

22. It didn't matter. The jury quickly returned a guilty verdict.

23. When the verdict was read, I stood in shock. I couldn't believe that this could happen in the United States.

24. I felt angry, frustrated, and helpless. I felt violated. I felt hopeless.

25. I was sentenced to 2 years and a day, minus 256 day's credit for time served.

26. I was 45 years old and had been working on making myself a better person. All those efforts were washed away.

## *My Incarceration*

27. I served my sentence at South Bay. It was a difficult 15 months.

28. South Bay is hectic, crowded, noisy, violent, and filthy.

29. I was in numerous fights.

30. I was routinely threatened by officers and other inmates.

31. Nearly every second of every day, I had to worry about my physical safety.

32. The threat of violence was constant. For my safety, I needed to stay alert. For this reason, I avoided medication as much as possible because it made me feel drowsy, "doped up," and vulnerable.

33. I had trouble coping. My anger and frustration led to numerous incidents where I acted out.

34. My behavior let to numerous disciplinary incidents. I was placed in isolation on several occasions, sometimes lasting weeks. Isolation means being in solitary lockup

in a small cell for 23 hours of day. For one hour, you are allowed outside to shower or walk around a small area.

35. The normal prison life was not much better. You were confined for much of the day to small cell that you occupied with a cellmate. Very often you and your cellmate didn't get along. Sometimes there were fights. Sometimes for your safety, you had to make sure you were the last to fall asleep and the first to wake up.

36. On one side of the small cell was a bathroom that you shared. There was no privacy or dignity. If your cellmate was dirty, you either had to live with it or clean up the messes yourself.

37. As the cells don't have showers, all showering was communal and done during break times. You couldn't always control the water temperature. It was common for there to be feces on the shower floor. You spent as little time as possible because of your vulnerability to attack.

38. From the day I arrived, I was strip-searched by officers repeatedly and randomly. During strip-searches, officers often said disrespectful and humiliating things to degrade me and make me feel more violated.

39. While I had access to psychiatric "care," it was a "joke." When I tried to explain to the psychiatrist that I was innocent, he accused me of lying and informed me that he hears such "ridiculous" claims all the time.

40. The food was terrible. You ate out of necessity. You had to inspect everything you ate and the plates you used for rodent droppings.

41. South Bay was infested with rodents.

42. You were allowed one hour of recreation time per day. There was an outdoor decked with a small cage space. But it was disgusting because the officers urinated there all the time, making a foul stench that could not be tolerated.

43. The outdoor space was dirty, disgusting, and had no grass, trees, or view.

44. There was an indoor gym but it too was dusty, dirty. There was weight lifting equipment that was dangerous because pieces were not properly secured or bolted down.

45. Throughout my incarceration, I become more and more depressed. The only way I could survive was to block my thoughts. I stopped thinking about anything but survival. I stopped caring.

46. In late 2010, I learned that I had lost my appeal.

47. To the best of my recollection, I was released on March 7, 2011. I do not have a record of my release, nor did I keep a log of how many days I was in prison. However, that release date is consistent with a sentence of 2 years and a day minus 256 days. Attached as **Exhibit A** is a true and accurate copy of my Revised Mittimus.

*Impact of My Conviction and Incarceration*

48. My conviction and incarceration had a major impact on my life.

49. After my release, I had a hard time finding work. Employers don't like to hire people with drug convictions.

50. Because I couldn't find work, I had a hard time finding housing. Drug convictions are disqualifying for most subsidized or low cost housing options.

51. From time to time, I had to live in homeless shelters, which was humiliating.

52. My mom was devastated because of my conviction. She knew I was telling truth. But my conviction and incarceration really hurt her and broke her heart.

53. My mom was most upset that I had been making progress in my personal life and that all of that got came to a stop.

54. She was in her 80s, and so it was hard for her to visit my prison. She walks with a cane, and if she tried to visit me they would take the cane from her.

55. My incarceration cut me off from family and friends.

56. I had very few visitors because you had to be strip-searched before and after any visits.

57. My incarceration changed my outlook on life. I was viewed as a drug dealer. It hurt my standing in my family. I stopped trusting people in positions of power.

58. Furthering my education was not an option because I was told I wouldn't qualify for financial aid.

59. In 2012, I found out that Annie Dookhan was accused of cutting corners, making mistakes, and contaminating samples. A CPCS lawyer told me that my name came up in a computer search of Annie Dookhan cases.

60. This was the first time that felt like justice was on my side.

61. I filed a motion for new trial in October 15, 2012, but I had to wait until April 2013 before it was granted. The prosecutor did not apologize or say anything recognizing what I had been through.

62. I am still angry and upset about what I went through and the time that I lost that I will never get back.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 5TH OF JANUARY 2017,

Leonardo Johnson